**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

MCKAYLA LONG, ET AL.                    CASE NO.  6:22-CV-3301

VERSUS                                  JUDGE ROBERT R. SUMMERHAYS

U S COMMISSIONER OF SOCIAL              MAGISTRATE JUDGE CAROL B.
SECURITY                                WHITEHURST

## REPORT  AND  RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability. Considering the administrative record, the briefs of the parties, and the applicable law, it is recommended that the Commissioner's decision be REVERSED AND REMANDED.

### ADMINISTRATIVE PROCEEDINGS

The original claimant in this matter, Berry Lowell Long, is a deceased military veteran[1] who committed suicide on July 29, 2021, before his hearing date in this matter.  His children -- McKayla, Morgan, and Declan Long[2] -- were substituted as interested parties and are the claimants in interest in this social security appeal.  The following facts pertain to Berry Lowell Long as the original claimant for benefits.

---

[1] According to the record, the claimant was in the Army from October 2008 to November 2014 and was deployed in Afghanistan from 2010-11. Id. At 383, 385.

[2] McKayla and Morgan are twin daughters born to Jennifer Waters; Declan is Mr. Long's son born to Courtney Russo.

1

Long fully exhausted his administrative remedies prior to filing this action in federal court. Long filed an application for disability insurance benefits ("DIB") on August 28, 2019, alleging disability beginning on March 22, 2019 due to physical and mental impairments.[3] His application was denied.[4] Long requested a hearing on December 13, 2019,[5] and a hearing was scheduled on July 16, 2020.[6] Review of the transcript of the July 16, 2020 hearing reveals that Long was unable to participate in the hearing, inasmuch as he was in a residential treatment facility for treatment of post-traumatic stress disorder ("PTSD") and substance abuse disorder (alcohol). Although the ALJ refused to grant a continuance of the hearing on the basis of the claimant's limited ability to use a telephone while in residential treatment, he agreed to postpone the hearing on the basis of COVID-19.[7] Thus, the hearing was rescheduled on September 1, 2021.[8]

---

[3]     Rec. Doc. 6 at p. 261.

[4]     *Id.* at pp. 65-82.

[5]     *Id.* at 94.

[6]     *Id.* at 123.

[7]     *Id.* at 59-64.

[8]     *Id.* at 154.

The transcript of the September 1, 2021 hearing reveals that Long had passed away on July 19, 2021.[9]   The ALJ granted a continuance of the hearing to accommodate the substitution of interested parties.

A hearing was ultimately held on December 22, 2021, before Administrative Law Judge David Ettinger.[10]   Appearing at that hearing was Courtney Russo, the mother of one of Long's children, Declan Long, as well as counsel.  The ALJ issued a decision on January 13, 2022,[11] concluding that Long was not disabled within the meaning of the Social Security Act ("the Act") from March 22, 2019 through January 13, 2022, the date of the decision.  The substituted claimants asked for review of the decision, but the Appeals Council concluded on June 23, 2022 that no basis existed for review of the ALJ's decision.[12]   Therefore, the ALJ's decision became the final decision of the Commissioner for the purpose of the Court's review pursuant to 42 U.S.C. § 405(g).  The claimants then filed this action seeking review of the Commissioner's decision.

---

[9]      *Id.* at 52-58.

[10]     The December 22, 2021 hearing transcript is found at Rec. Doc. 6 at pp. 32-51.  The September 1, 2021 hearing transcript is found at Rec. Doc. 6, pp. 54-58.

[11]     *Id.* at pp. 11-19.

[12]     *Id.* at pp. 1-3.

## Summary of Pertinent Facts

Long was born on September 1, 1984.[13]  He died on July 29, 2021, at the age of 36 and would have been 37 at the time of the ALJ's decision.  He had a high school education and two years of college,[14] and past relevant work experience as a pipefitter and infantryman.[15]  Long alleged that he had been disabled since March 22, 2019, due to PTSD, substance abuse disorder, and depression, as well as bilateral tinnitus, right and left shoulder pain, and lumbar spine pain.[16]

## Analysis

### A.    Standard of Review

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[17]  "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as

---

[13]    *Id.* at p. 214.

[14]    *Id.* at p. 266.

[15]    *Id.* at p. 261, 265.

[16]    *Id.* at p. 265.

[17]    *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

a reasonable mind might accept as adequate to support a conclusion."[18]  Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[19]

If the Commissioner's findings are supported by substantial evidence, then they are conclusive and must be affirmed.[20]  In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[21]  Conflicts in the evidence and credibility assessments are for the Commissioner to resolve, not the courts.[22]  Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:  (1) objective medical facts, (2) diagnoses and opinions of treating and examining

---

[18]     *Villa v. Sullivan*, 895 F.2d at 1021-22 (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).

[19]     *Hames v. Heckler*, 707 F.2d at 164 (quoting *Hemphill v. Weinberger*, 483 F.2d 1137. 1139 (5th Cir. 1973), and *Payne v. Weinberger*, 480 F.2d 1006, 1007 (5th Cir. 1973)).

[20]     42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173; *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

[21]     *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1021; *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *Carey v. Apfel*, 230 F.3d at 135; *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).

[22]     *Martinez v. Chater*, 64 F.3d at 174.

physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[23]

## B.   Entitlement to Benefits

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[24]  Every individual who meets certain income and resource requirements, has filed an application for benefits, and is determined to be disabled is eligible to receive Supplemental Security Income ("SSI") benefits.[25]

The term "disabled" or "disability" means the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[26]  A claimant shall be determined to be disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but

---

[23]   *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991); *Martinez v. Chater*, 64 F.3d at 174.

[24]   *See* 42 U.S.C. § 423(a).

[25]   42 U.S.C. § 1382(a)(1) & (2).

[26]   42 U.S.C. § 1382c(a)(3)(A).

cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[27]

## C.    Evaluation  Process  and  Burden  of  Proof

The Commissioner uses a sequential five-step inquiry to determine whether a claimant is disabled.   This process required the ALJ to determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work he did in the past; and (5) can perform any other work at step five.[28]  If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends.  "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."[29]

---

[27]     42 U.S.C. § 1382c(a)(3)(B).

[28]     20 C.F.R. § 404.1520; see, e.g., *Wren v. Sullivan*, 925 F.2d at 125; *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Masterson v. Barnhart*, 309 F.3d 267, 271-72 (5th Cir. 2002); *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000).

[29]     *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

Before going from step three to step four, the Commissioner assesses the claimant's residual functional capacity[30] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record.[31]  The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[32]

The claimant bears the burden of proof on the first four steps.[33]  At the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[34]  This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[35]  If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to

---

[30]     20 C.F.R. § 404.1520(a)(4).

[31]     20 C.F.R. § 404.1545(a)(1).

[32]     20 C.F.R. § 404.1520(e).

[33]     *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[34]     *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[35]     *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

rebut this finding.[36]  If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[37]

**D.    T̲H̲E̲ ̲A̲L̲J̲'̲S̲ ̲F̲I̲N̲D̲I̲N̲G̲S̲ ̲A̲N̲D̲ ̲C̲O̲N̲C̲L̲U̲S̲I̲O̲N̲S̲**

In this case, the ALJ determined that the claimant meets the insured status requirements of the Social Security Act through June 30, 2023.[38]  He further determined, at step one, that Long did not engage in substantial gainful activity during the period from his amended alleged onset date of March 22, 2019, through his date last insured of June 30, 2023.[39]  No party challenges this finding.

At step two, the ALJ found that Long has the following severe impairments: PTSD and alcohol dependence.[40]  This finding is supported by the evidence in the record.

---

[36]    *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[37]    *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992), citing *Johnson v. Bowen*, 851 F.2d 748, 751 (5th Cir. 1988).  See, also, 20 C.F.R. § 404.1520(a)(4).

[38]    Rec. Doc. 6 at p. 13.

[39]    *Id.*

[40]    *Id.*

At step three, the ALJ found that Long has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment.[41] The claimants challenge this finding.

The ALJ found that Long has the residual functional capacity to perform a full range of work at all exertional levels with the following nonexertional limitations: he is limited to simple repetitive work; cannot maintain attention or concentration for longer than two hours without interruption or for more complicated than simple work instructions; cannot interact with the public; and cannot more than occasionally interact with supervisors or coworkers.[42]  The claimants challenge this finding.

At step four, the ALJ found that Long is not capable of performing his past relevant work.[43]  The claimants do not challenge this finding.

At step five, the ALJ found that Long was not disabled from March 22, 2019, through the date of the decision because there are jobs in the national economy that he could have performed, including hospital cleaner and industrial cleaner.[44]  The claimants challenge this finding.

---

[41]    *Id.* at p. 14.

[42]    *Id.* at p. 15.

[43]    *Id.* at p. 18.

[44]    *Id.* at p. 19.

### E.    THE ALLEGATIONS OF ERROR

The claimant argues that the ALJ committed the following errors:

1.    The ALJ erred in failing to consider Listing 12.04 (depressive disorder, bipolar disorder, and related disorders) and Listing 12.06 (anxiety disorder and obsessive compulsive disorder) and that this error was not harmless; and

2.    The ALJ erred in assessing the claimant's residual functional capacity.

The undersigned will consider each alleged error in turn.

### 1.  Relevant Medical Evidence

Long was enlisted in the United States Army as an infantryman from January 2004 to November 2012. During that time, he was deployed to Afghanistan in a combat role from August 2011 to 2012.

The record is replete with evidence of Long attempting to receive – and actually receiving – professional medical treatment for severe PTSD, depression, anxiety, and substance use disorder.  The medical records show that Long called the VA National Suicide Prevention Hotline on January 5, 2017 to talk about substance abuse/addiction, mental health issues, relationship problems, and PTSD symptoms. At that time, Long "stated repeatedly that he would like to go to a facility to get help tomorrow."[45]  Long called the hotline again, asking if he could check into a VA

---

[45]    *Id.* at 1083.

rehabilitation facility in Nashville for treatment of PTSD and alcohol abuse. Specifically, Long asked if he could go to his local emergency room and then be transported to the VA hospital.  Despite this plan, treatment notes dated January 9, 2017 show that, although Long went to the emergency room, he was not transported to the VA.[46]  Long stated that he wanted a residential treatment program for treatment of his PTSD and alcohol abuse and asked for a referral for the same.[47]  Additional medical records from this time period show that Long told hospital staff that he was having nightmares, waking up paralyzed and sweating, and was experiencing flashbacks and extreme hypervigilance.[48]

Records dated January 12, 2017, show that Long had contact with the hotline again, where he was reported to be "very emotional throughout the call," indicating that he had had a few beers, and asking: "Can someone come get me?  I need help, everyone in my family is scared."[49]  Long indicated that he feared losing his wife as a result of his mental state and stated that he had raised a hand to her.  He further

---

[46]     *Id.* at 1079

[47]     *Id.*

[48]     *Id.* at 1558.

[49]     *Id.* at 1077.

stated, "I am not right and I want to get better for my family."[50]  Rescue was initiated, and the police transported Long to a hospital that day.[51]

Records dated January 17, 2017 show that Long called the hotline again, stating he had received medication at the hospital that was working because it made him feel sick when he drank alcohol, but he stated he "still feels he is a danger to himself."[52]  Although stating that he was "not suicidal," Long told the hotline operator that he had attempted to poison himself with carbon monoxide from a car three years before.[53]  The hotline operator told Long to make his way to the nearest VA hospital, and Long told the responder that a friend would take him.[54]

Long contacted the suicide prevention hotline again on May 16, 2018, stating he was having a mental health crisis, after which he was hospitalized at Three Rivers Hospital in Waverly, Tennessee and held on suicide watch.[55]  Long requested a transfer to a VA hospital, stating that he needed inpatient alcohol treatment, not IOP

---

[50]    *Id.* at 1077.

[51]    *Id.*

[52]    *Id.* at 1073.

[53]    *Id.* at 1074.

[54]    *Id.* at 1074.

[55]    *Id.* at 1541.

(intensive outpatient).[56]  The records show that there were no beds for inpatient treatment at the VA hospital at that time,[57] but Long was eventually able to get a bed on August 21-22, 2018, at which time he checked himself in for alcohol detox.[58]

At the time he was admitted, Long indicated that one of his triggers for drinking was anxiety.[59]  Long further stated that his anxiety was so intense that he went to the ER three times believing that he was having a heart attack.[60]  At that time, the claimant also reported depression; an inability to sleep more than 4 hours per night; and feelings of guilt and worthlessness because of his drinking.[61]   While in detox, Long told hospital staff that he was ready to enter a residential rehabilitation program after detoxing.[62]  A list of medications prescribed to Mr. Long at the time he was discharged from detox on August 29, 2018, contains the following medications: Fluoxetine; Hydroxyzine; Melatonin; Naltrexone PO and IM;

---

[56]     *Id.* at 1071.

[57]     *Id.*

[58]     *Id.* at 394.

[59]     *Id.* at 406.

[60]     *Id.* at 394-95.

[61]     *Id.*

[62]     *Id.* at 401, 404.

Trazodone; and a Nicotine patch.[63]  The record shows that Long was also prescribed the following medications at various times to treat his symptoms: Escitalopram, Prazosin, Adderall, Seroquel, and Clonazepam.

In April 2019, Mr. Long was assessed with a PHQ-9 score of 14, indicating moderate depression.[64]  His responses to questions from medical professionals on that date show that he reported having trouble falling asleep or staying asleep for 20 of the previous 30 days, and felt anxious, depressed, angry, or upset for most of the day for 15 of the last 30 days.[65]  The record shows numerous medical appointments where Mr. Long received Naltrexone treatments for management of his substance use disorder.[66]  On June 10, 2019, the claimant had a psychiatry consult with the VA at which time his PHQ-9 Depressional Scale Score was 11, characterized as moderate depression.[67]  Long was also assessed with a GAD-7 score of 11, indicating an anxiety condition that should be carefully evaluated.[68]

---

[63]    *Id.* at 451, 666.

[64]    *Id.* at 433.

[65]    *Id.* at 435.

[66]    *Id.* at 432.

[67]    *Id.* at 426-27.

[68]    *Id.* at 426.

During a June 27, 2019 incident when the claimant went to the VA hospital, the examiner noted that the claimant's thoughts were "all over the place, jumping from problem to problem before I can completely address the previous stated complaint/concern."[69]  Records show that Long stopped taking his Fluoxetine in July 2019, believing that it made him more angry.[70]  Treatment records dated August 2019 and October 2019 show that Long drove 2 ½ hours to Murfreesboro, Tennessee to get his Naltrexone injections, but that he relapsed in September 2019, drank alcohol, and was a no-show for his September appointment.[71]

On April 17, 2020, Long told a VA clinician that he needed more than outpatient treatment for his PTSD, anger issues, and substance use disorder, stating that he had stolen Adderall from his girlfriend's purse, was having outbursts, and causing damage to property during "tantrums."[72]  On April 27, 2020, Long was notified that he was recommended for a residential level of care, but that actual admissions to residential programs were being postponed because of Covid.[73]

---

[69]     *Id.* at 379.

[70]     *Id.* at 368.

[71]     *Id.* at 467-76.

[72]     *Id.* at 789.

[73]     *Id.* at 794.

In June 2020, Mr. Long was admitted to the VA Mental Health Residential Rehabilitation Treatment Program in Murfreesboro, Tennessee for treatment of PTSD and alcohol use disorder.[74]  While in inpatient treatment, Long participated in group therapy and individualized therapy with his therapist pursuant to his treatment plan, which focused on practicing mindfulness to cope with depression, understanding the depression cycle, and controlling anger.[75]  It appears that Long was discharged on July 30, 2020, at which time he relocated to Louisiana.  Treatment records from his time in residential treatment show a slow, steady alleviation of symptoms.[76]  At the time he was discharged, Long was encouraged to get outpatient help.

During August 2020, medical records show that Long participated in some telephone medication management with VA clinicians, but he was a no-show for several appointments.[77]  On or around August 28-29, 2020, Mr. Long self-presented to Rapides Regional Medical Center in Alexandria, Louisiana after taking 50 Trazodone pills with alcohol while being evacuated during a hurricane.[78]  Long

---

[74]     *Id.* at 1141.

[75]     *Id.* at 1115.

[76]     *Id.* at 1106-1358

[77]     *Id.* at 949-50.

[78]     *Id.* at 1005.

denied that the foregoing was a suicide attempt, stating instead that he was simply being reckless.  Hospital records characterize the event as either a suicide attempt or an "impulsive overdose [of] Trazodone while intoxicated on alcohol."[79]  Long was intubated, placed in ICU, and later stabilized.  He was then discharged and was immediately admitted to Oceans Behavioral Health Hospital in Opelousas, Louisiana, a residential inpatient treatment program, for acute psychiatric treatment for depression and substance abuse.[80]

On September 3, 2020, Long was assessed by the VA to be at a high risk for suicide and was placed on suicide watch, meaning that the VA conducted regular follow ups with Long by telephone.[81]  On September 15, 2020, records show that Long was admitted into the Heroes Program at New Beginnings, a residential treatment facility, for acute inpatient care.[82]  While at Heroes, Long's PTSD, depression, and anxiety symptoms appeared to gradually improve.  Upon discharge from Heroes, Long went to live in a sober living facility in Lafayette, Louisiana.

---

[79]    *Id.* at 1731.

[80]    *Id.* at 942-45.

[81]    *Id.* at 941.

[82]    *Id.* at 933-34.

On November 18, 2020, Long had an in-person appointment with the VA. At that appointment, the clinician identified Long as being high risk for suicide, at which time Long stated that he had never attempted suicide.[83]  Long was a no-show for his November 25, 2020 and November 28, 2020 appointments.  Treatment notes dated December 2, 2020 show that Long minimized his PTSD and stated that his medicines were working, therefore he did not feel he needed talk therapy.[84]  On December 9, 2020, Long denied any suicidal ideation and denied depression and anxiety.[85]  Long was a no show for his telephone appointments with the VA on January 21-22 and January 25, 2021, and February 3, 4, and 5, 2021.  On February 22, 2021, Long told his VA clinician that he felt he was on too many medications and felt like a "zombie," so he stopped taking his Venlafaxine (treatment for depression), Prazosin (treatment for nightmares), Mirtazine (treatment for major depressive disorder), and Elavil (treatment for depression and mood disorders).  He also indicated he had discontinued his ADHD medication.  He reported feeling good.[86]

---

[83]    *Id.* at 913.

[84]    *Id.* at 901.

[85]    *Id.* at 896

[86]    *Id.* at 880

On March 11, 2021, Long reported feeling good and was doing well.  At that time, Long denied suicidal ideation, depression, or anxiety.  Carrie Brensike, a nurse practitioner, diagnosed Long with chronic PTSD.[87]

On May 20, 2021, Long's PHQ-9 score was 22, indicating significant depression.[88]  His PTSD Checklist Score 5 score was 64, which was noted to be "well above . . . the minimum cutoff score of 33."[89]  At that time, Mr. Long reported that he had been sober for 9 months and "thought it would all get better once [he] stopped drinking but it didn't."[90]  Long reported the following:

- Nightmares related to his index trauma occurring about three times per week;

- Described internal and external avoidance related to his index trauma;

- Angry outbursts about twice per week; he gets frustrated with small things and goes from "0 to 100;"

- Hypervigilance "whenever he is not sleeping;"

- He attends AA meetings regularly but he has to sit in a certain spot and if anything suspicious happens, he will leave;

---

[87]     *Id.* at 877-78.

[88]     *Id.* at 865.

[89]     *Id.* at 973.

[90]     *Id.* at 863.

- Sleep issues;

- Loss of interest in previously enjoyable activities including fishing and playing sports;

- Disinterest in people and difficulty connecting with others.[91]

On June 7, 2021, Mr. Long attended a treatment/orientation session at the VA PTSD clinic where treatment options available to him were discussed.[92]  On July 29, 2021, Long committed suicide.[93]

### 2.  Listing 12.04 and Listing 12.06

The ALJ determined that the claimant's PTSD and alcohol abuse, although severe, did not meet a listed impairment.  The claimants challenge this finding but focus more on the ALJ's failure to reference or consider Listings 12.04 and 12.06 at all in his ruling.  The record shows that the ALJ did not reference either of these listings in his analysis, despite the fact that Long sought benefits for disabling PTSD, substance abuse disorder, and depression, as well as several physical impairments.[94]

---

[91] 973-74

[92]     *Id.* at 1576.

[93]     Claimant's Original Brief, Rec. Doc. 9, n.1.

[94]     *Id.* at p. 265.

Listing 12.04 provides the criteria for depressive, bipolar, and related disorders and Listing 12.06 provides the criteria for anxiety and obsessive-compulsive disorders.  *See* 20 C.F.R. Pt. 404, Subpt. P, App'x 1 §§12.04 & 12.06. As an initial matter, the undersigned notes Listings 12.04, 12.06 and 12.15 (the listing for PTSD) employ the same analytical framework, that is, for each of these three listings, Paragraph A describes the medical diagnoses and symptoms that must be present in the record (for 12.4 – depression; for 12.6 – anxiety; and 12.15 – PTSD), while Paragraph B outlines four categories of mental functioning used to evaluate a claimant's work limitations caused by the disorder, and Paragraph C outlines the criteria used to determine whether the mental disorder is serious and persistent.  Because the analysis for each of these Listings is the same – and, indeed, because the requirements under Paragraphs B and C are identical – courts have held that any failure to specifically reference one of these three listings is harmless error where the ALJ actually analyzes the requirements for one of the Listings.  *See, e.g., Mcgowan v. Saul*, 2021 WL 799325, at *4 (S.D. Tex. Jan. 6, 2021), *report and recommendation adopted*, 2021 WL 951859 (S.D. Tex. Mar. 10, 2021) (courts have found an ALJ's failure to specifically evaluate plaintiff under Listing 12.04 harmless because the ALJ did discuss paragraph criteria for Listing 12.06, which "apply with equal force" to paragraph criteria for Listing 12.04); *Saleeba v. Berryhill*, 2019 WL 1386817, at *5 (S.D. Tex. Mar. 5, 2019) (finding ALJ's failure to mention Listing

12.02 harmless because the paragraph B and C criteria for Listings 12.03 and 12.04 -- which the ALJ did discuss -- apply equally to Listing 12.02), *report and recommendation adopted*, 2019 WL 1383030 (Mar. 26, 2019); *Lara v. Berryhill*, 2017 WL 5952725, at *5 (S.D. Tex. Nov. 28, 2017) (finding the ALJ's failure to specifically evaluate plaintiff under Listing 12.04 harmless because the ALJ did discuss paragraph criteria for Listing 12.06, which "apply with equal force" to paragraph criteria for Listing 12.04).[95]

In the instant case, the ALJ expressly considered whether the Paragraph B and C criteria of Listing 12.15 for PTSD are satisfied. Ordinarily, if substantial evidence supported this finding, the undersigned might conclude that the ALJ's failure to reference Listings 12.04 and 12.06 specifically was harmless error. However, because the undersigned cannot conclude that there is substantial evidence in the record to support the ALJ's findings that Long's PTSD, depression, and anxiety –

---

[95] Both listings are divided into paragraphs A, B, and C: paragraph A describes the medical diagnoses and symptoms that must be present in the record; paragraph B outlines four categories of mental functioning used to evaluate a claimant's work limitations caused by the disorder; and paragraph C outlines the criteria used to determine whether the mental disorder is serious and persistent. *Id.* § 12.00(A)(2). In other words, "[t]he criteria in paragraph A substantiate medically the presence of a particular mental disorder" and "[t]he criteria in paragraphs B and C describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." *Willingham v. Comm'r of Soc. Sec. Admin.*, No. 12-CV-242, 2014 WL 1050286, at *3 n.3 (E.D. Tex. Mar. 14, 2014) (quotations omitted). To meet either Listing 12.04 or 12.06, a claimant must satisfy the requirements of paragraphs A and B or paragraphs A and C. 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(A)(2); *Baker v. Berryhill*, No. 18-CV-686, 2019 WL 4418439, at *4 (N.D. Tex. Apr. 11, 2019), *report and recommendation adopted*, 2019 WL 2865045 (July 3, 2019).

either singly or in combination – caused only moderate limitations in his ability to work, this matter must be remanded.

Paragraph B requires a claimant to exhibit extreme limitation in one area or marked limitation in two areas of mental functioning: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(A)(2)(b). An extreme limitation exists when a claimant is unable to function independently, appropriately, effectively, and on a sustained basis, and a marked limitation exists when a claimant is seriously limited in these areas. *Id.* § 12.00(F)(2). Paragraph C requires a claimant to show a medically documented history of the disorder for at least two years, reliance on medical treatment to diminish symptoms, and only marginal adjustment to the requirements of daily life— *i.e.*, the claimant has "minimal capacity to adapt to changes in ... environment." *Id.* § 12.00(G); *see also id.* § 12.00(A)(2)(c). *Mcgowan v. Saul*, 2021 WL 799325, at *3–4 (S.D. Tex. Jan. 6, 2021), *report and recommendation adopted,* 2021 WL 951859 (S.D. Tex. Mar. 10, 2021).

The ALJ determined that Mr. Long had only moderate limitations in the area of understanding, remembering and applying information, noting that the claimant could perform simple maintenance and go to doctors' appointments. The ALJ concluded that Mr. Long had only moderate limitations in the area of interacting

with others, noting he could get along with, and live with, others. The ALJ further determined that Mr. Long had moderate limitations in the area of concentration, persistence and pace, because he is able to watch college football on TV. And finally, the ALJ determined that the claimant has only moderate limitations in the area of his ability to adapt or manage himself, because he was able to handle self-care and personal hygiene and care for his children. Finding that the evidence in the record does not support a finding that Long had only moderate impairments in the areas of "interacting with others" and "ability to adapt or management oneself," the undersigned concludes thus matter must be remanded.

In evaluating a claimant's mental impairments, the regulations provide specific guidance for the consideration of psychosocial support and both inpatient and outpatient mental health treatment, as well as sober living facilities, on a claimant's ability to work, as follows:

> D. How do we consider psychosocial supports, structured settings, living arrangements, and treatment?
>
> 1. General. Psychosocial supports, structured settings, and living arrangements, including assistance from your family or others, may help you by reducing the demands made on you. In addition, treatment you receive may reduce your symptoms and signs and possibly improve your functioning or may have side effects that limit your functioning. Therefore, when we evaluate the effects of your mental disorder and rate the limitation of your areas of mental functioning, we will consider the kind and extent of supports you receive, the characteristics of any structured setting in which you spend your time, and the effects of any treatment. This evidence may

come from reports about your functioning from you or third parties who are familiar with you, and other third-party statements or information. Following are some examples of the supports you may receive:

a. You receive help from family members or other people who monitor your daily activities and help you to function. For example, family members administer your medications, remind you to eat, shop for you and pay your bills, or change their work hours so you are never home alone.

b. You participate in a special education or vocational training program, or a psychosocial rehabilitation day treatment or community support program, where you receive training in daily living and entry-level work skills.

c. You participate in a sheltered, supported, or transitional work program, or in a competitive employment setting with the help of a job coach or supervisor.

**d. You receive comprehensive "24/7 wrap-around" mental health services while living in a group home or transitional housing, while participating in a semi-independent living program, or while living in individual housing (for example, your own home or apartment).**

**e. You live in a hospital or other institution with 24–hour care.**

**f. You receive assistance from a crisis response team, social workers, or community mental health workers who help you meet your physical needs, and who may also represent you in dealings with government or community social services.**

g. You live alone and do not receive any psychosocial support(s); however, you have created a highly structured environment by eliminating all but minimally necessary contact with the world outside your living space.

2. How we consider different levels of support and structure in psychosocial rehabilitation programs.

    a. **Psychosocial rehabilitation programs are based on your specific needs. Therefore, we cannot make any assumptions about your mental disorder based solely on the fact that you are associated with such a program. We must know the details of the program(s) in which you are involved and the pattern(s) of your involvement over time.**

    b. **The kinds and levels of supports and structures in psychosocial rehabilitation programs typically occur on a scale of "most restrictive" to "least restrictive." Participation in a psychosocial rehabilitation program at the most restrictive level would suggest greater limitation of your areas of mental functioning than would participation at a less restrictive level. The length of time you spend at different levels in a program also provides information about your functioning. For example, you could begin participation at the most restrictive crisis intervention level but gradually improve to the point of readiness for a lesser level of support and structure and possibly some form of employment.**

3. How we consider the help or support you receive.

    a. We will consider the complete picture of your daily functioning, including the kinds, extent, and frequency of help and support you receive, when we evaluate your mental disorder and determine whether you are able to use the four areas of mental functioning in a work setting. The fact that you have done, or currently do, some routine activities without help or support does not necessarily mean that you do not have a mental disorder or that you are not disabled. For example, you may be able to take care of your personal needs, cook, shop, pay your bills, live by yourself, and drive a car. You may demonstrate both strengths and deficits in your daily functioning.

27

     b. You may receive various kinds of help and support from others that enable you to do many things that, because of your mental disorder, you might not be able to do independently. Your daily functioning may depend on the special contexts in which you function. For example, you may spend your time among only familiar people or surroundings, in a simple and steady routine or an unchanging environment, or in a highly structured setting. However, this does not necessarily show how you would function in a work setting on a sustained basis, throughout a normal workday and workweek. (See 12.00H for further discussion of these issues regarding significant deficits in adaptive functioning for the purpose of 12.05.)

    4. How we consider treatment. We will consider the effect of any treatment on your functioning when we evaluate your mental disorder. Treatment may include medication(s), psychotherapy, or other forms of intervention, which you receive in a doctor's office, during a hospitalization, or in a day program at a hospital or outpatient treatment program. With treatment, you may not only have your symptoms and signs reduced, but may also be able to function in a work setting. However, treatment may not resolve all of the limitations that result from your mental disorder, and the medications you take or other treatment you receive for your disorder may cause side effects that limit your mental or physical functioning. For example, you may experience drowsiness, blunted affect, memory loss, or abnormal involuntary movements.

20 C.F.R. § Pt. 404, Subpt. P, App. 1 (emphasis added).

    The record contains witness hearing testimony, Long's own statements to clinicians noted in the treatment records, and medical evidence supporting the claimants' allegations that Long had more than "moderate" limitations in the area of "interacting with others." While the ALJ found that Long could get along and live

28

with others, Courtney Russo, Long's live-in girlfriend for more than eight years, testified at the December 22, 2021 hearing that the police had been called so many times to their residence that they would stop in and check on Long on a regular basis.[96]   On January 5, 2017, Long called the VA National Suicide Prevention Hotline to talk about substance abuse/addiction, mental health issues, and *relationship problems.*  One week later, on January 12, 2017, Long called the hotline again, where he was reported to be "very emotional throughout the call," and stated that "I need help, everyone in my family is scared."[97]  Long indicated that he feared losing his wife as a result of his mental state and that he had raised a hand to her, and further stated, "I am not right and I want to get better for my family."[98]

Long himself told a VA clinician that he was damaging property and having to make repairs to doors and drywall because of his tantrums.[99]  VA records from that contact note that police were called to rescue Long and take him to the hospital for treatment.[100]  Evidence in the record also shows that when Long left the Heroes

---

[96]     *Id.* at 46.

[97]     *Id.* at 1077.

[98]     *Id.* at 1077.

[99]     *Id.* at 789.

[100]     *Id.*

program, he went to live in a sober living facility.[101]  The ALJ's conclusion that Long was only moderately impacted in this area because he was "able to live with and get along with others" is simply not supported by the evidence in the record.

Nor is the finding that Long had only a moderate impairment in the area of his "ability to adapt or manage himself," a conclusion the ALJ reached because he found that Long was able to handle self-care and personal hygiene and care for children.  The undersigned considers this issue with the following regulation in mind:

> **Participation in a psychosocial rehabilitation program at the most restrictive level would suggest greater limitation of your areas of mental functioning than would participation at a less restrictive level. The length of time you spend at different levels in a program also provides information about your functioning.**

The treatment records show a demonstrated history of Long seeking treatment for PTSD symptoms (which included recurring nightmares of combat), depression, extreme anxiety (which included internal and external hypervigilance), and substance use disorder – all of which are well-documented in the record and all conditions for which Long was prescribed, and took, a laundry list of medications to control his symptoms.  The undersigned notes that Long drove 2 ½ hours on a regular basis to get his Naltrexone injections in his quest to stay sober.  In addition to this,

---

[101]    *Id.* at 896.

the record shows that Long voluntarily entered a VA hospital for alcohol detox in August 2018;[102] was admitted to a residential treatment program in Tennessee for treatment of PTSD and substance use disorder in June 2020;[103] and was hospitalized in late August 2020 following a suicide attempt by overdose.[104]  After that suicide attempt, Long entered another residential treatment program for acute psychiatric treatment for depression and substance abuse,[105] followed by residential treatment in the Heroes Program at New Beginnings from September 2020 to November 2020.[106] Upon his discharge from the Heroes Program, Long lived in a sober living facility, following which he committed suicide.  If the foregoing medical history does not demonstrate an inability to adapt or manage oneself, the undersigned can think of few scenarios that do.

The regulations clearly state:

> . . . **when we evaluate the effects of your mental disorder and rate the limitation of your areas of mental functioning, we will consider the kind and extent of supports you receive, the characteristics of any structured setting in which you spend your time, and the effects of any treatment.**

---

[102]     *Id.* at 394

[103]     *Id.* at 1141.

[104]     *Id.* at 1005.

[105]     *Id.* at 942-45.

[106]     *Id.* at 933-34

The ALJ includes several references in his ruling to treatment records wherein Long indicated that he was not depressed.[107] Without proper context, however, many of these treatment notes are misleading. For instance, on August 27, 2018, Long reported that he had significant improvements in his mood, sleep and appetite and reported no depression or anxiety.[108] However, review of the complete medical records from that time period shows that Long made that report three days after checking into the hospital for inpatient alcohol detox on August 24, 2018.[109] Thus, at the time Long reported feeling better, he had been in the hospital for three days and was under the round-the-clock supervision of a medical team, with medication for depression and anxiety being administered by hospital staff.

Similarly, SSA points to a single page in a report dated October 12, 2020, wherein Long denies feelings of depression and/or anxiety.[110] However, full review of the entire report – which is a Discharge Summary from inpatient treatment after his August 2020 drug overdose – shows that when Long was admitted for treatment of his PTSD and depression after his overdose, he expressed regret that he had been

---

[107] *Id.* at 621, 699, 877, 880, 895, and 1005.

[108] *Id.* at 699.

[109] *Id.* at 748.

[110] *Id.* at 1005.

unsuccessful in ending his life,[111] which seems inconsistent with a finding that Long was managing himself with only moderate impairment.  Long's discharge summary from that hospital stay states that Long *was* feeling better at the time of discharge, however he was diagnosed with "major depression, single episode, severe, as well as posttraumatic stress disorder and alcohol use disorder, severe" at that time.[112]  At the time he was discharged, Long was prescribed the following medications over the course of his treatment to manage his PTSD, depression, and anxiety:

- Remeron 30 mg … for sleep
- Minipress 1 mb … for nightmares
- Effexor XR 75 mg … for depression
- Wellbutrin XL 150 mg … for depression[113]

The record shows the prescription of the following additional medications for the treatment of Long's PTSD, depression, and anxiety: Fluoxetine; Hydroxyzine; Melatonin; Naltrexone PO and IM; Trazodone;[114] Escitalopram, Prazosin, Adderall, Seroquel, and Clonazepam.

On September 15, 2020, upon discharge from the hospital, Long was admitted to the Heroes Treatment Program in Opelousas, Louisiana, a treatment facility for

---

[111]    *Id.* at 1005-09.

[112]    *Id.* at 1006.

[113]    *Id.* at 1008.

[114]    *Id.* at 451, 666.

military veterans.[115]  SSA points to treatment records dated December 9, 2020, February 22, 2021 and March 11, 2021, which show that Long denied feeling depressed or anxious.[116]  However, this time period was within 6 months of leaving the hospital after his suicide attempt, a time period during which he was admitted to a residential treatment program and living in a sober living facility.  Again, during that time period, every need was managed, controlled and supervised by a treatment team, and Long attended both individual and group therapy for hours each day to address his mental health issues.  Four months after the March 11, 2021 report, Mr. Long committed suicide.  Thus, while the record does show that the claimant had good days where he did not feel depressed or anxious, the record also shows that he had been diagnosed with depression and anxiety, along with chronic PTSD and substance abuse disorder, took a significant amount of medication for PTSD, nightmares, depression, and anxiety, for which he received almost constant treatment from 2018 until he ultimately killed himself.

Listing 12.04 requires a showing of five or more of the following: (1) depressed mood; (2) diminished interest in almost all activities; (3) appetite disturbance with change in weight; (4) sleep disturbance; (5) observable

---

[115]    *Id.* at 933.

[116]    *Id.* at 877, 880, 895, and 1005

psychomotor agitation or retardation; (6) decreased energy; (7) feelings of guilt or worthlessness; (8) difficulty concentrating or thinking; or (9) thoughts of death or suicide.

Based upon the undersigned's review of the evidence in the record, it appears that the ALJ did not properly apply the regulations to make specific findings with respect to Long's PTSD, depression, or anxiety and, thus, it appears that there is not substantial evidence to support the ALJ's finding that Long's PTSD and anxiety posed only moderate limitations in the requisite areas of mental functioning. For these reasons, this matter must be remanded for a full analysis of Long's alleged impairments at Step 3.

Because the undersigned concludes that the ALJ did not properly assess the claimant's mental impairments at Step 3, the court finds that the ALJ relied on testimony elicited by defective hypothetical questions at the administrative hearing. Thus, the ALJ did not carry his burden to show that, despite Long's impairments, Long could perform available work. *See, e.g., Boyd v. Apfel*, 239 F.3d 698, 708 (5th Cir. 2001).

Accordingly, the ALJ's decision should be REVERSED and this matter REMANDED to the Commissioner for the reasons stated herein.

## CONCLUSION AND RECOMMENDATION

Thus, for the foregoing reasons, the undersigned concludes that the ALJ's findings are not supported by substantial evidence in the record. Accordingly,

**IT IS THE RECOMMENDATION** of the undersigned that the decision of the Commissioner be **REVERSED** and that this matter be **REMANDED** to the Commissioner for additional findings at Step 3 and a comprehensive analysis of the claimant's residual functional capacity during the relevant time period.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error. See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).

THUS DONE in Chambers on this 28th day of August, 2023.

_____
Carol B. Whitehurst
United States Magistrate Judge